767 So.2d 1146 (2000)
Rosario DONATO, Appellant,
v.
AMERICAN TELEPHONE AND TELEGRAPH CO., Appellee.
No. SC93534.
Supreme Court of Florida.
January 20, 2000.
Rehearing Denied March 2, 2000.
*1147 Thomas J. Pilacek, Maitland, Florida, for Appellant.
Sylvia H. Walbolt, Daniel C. Johnson, and Matthew J. Conigliaro of Carlton, Fields, Ward, Emmanuel, Smith and Cutler, P.A., St. Petersburg, Florida, for Appellee.
ANSTEAD, J.
We have for review a question of Florida law certified by the Eleventh Circuit Court of Appeals that is determinative of a cause pending in that court and for which there appears to be no controlling precedent:
CAN AN INDIVIDUAL PROCEED UNDER THE FLORIDA CIVIL RIGHTS ACT BY ALLEGING THAT HE WAS DISCHARGED, IN VIOLATION OF THE PROHIBITION ON MARITAL STATUS DISCRIMINATION, BECAUSE HE IS MARRIED TO AN INDIVIDUAL WHO FILED SUIT AGAINST HIS EMPLOYER?
We have jurisdiction. Art. V, § 3(b)(6), Fla. Const. We answer the certified question in the negative and hold that the Florida Civil Rights Act does not recognize a cause of action for marital status discrimination where the discrimination is allegedly based on the actions of the claimant's spouse, rather than on the marital status of the claimant.

MATERIAL FACTS
The facts in this case are taken from the circuit court's opinion in Donato v. American Telephone & Telegraph Co., 146 F.3d 1329 (11th Cir.1998):
This case is brought by Rosario Donato, alleging that he was the victim of marital status discrimination when AT & T terminated his employment shortly after Mr. Donato's wife, a former AT & T employee, sued AT & T. Mr. Donato filed his complaint in 1996 under the Florida Civil Rights Act, which, inter alia, protects employees from discrimination based on marital status.
In March 1992, Mrs. Lynda Donato filed a claim against AT & T. On October 21, 1993, the Florida Commission on Human Relations concluded that there was reasonable cause to support Mrs. Donato's initial allegations of sex discrimination and retaliation by AT & T. She was discharged from her position with AT & T in February 1994, and filed a federal action in August 1994, alleging sex discrimination and retaliatory discharge. In October 1994, Mrs. Donato applied for a temporary clerical position in the division of AT & T which employed her husband. During a meeting with manager Al Facini, she disclosed her lawsuit against AT & T and was told that she was "over-qualified" for the open position.
In November 1994, Mr. Donato was informed that his position as a Systems Analyst was placed "at risk", allegedly due to Mr. Donato's poor performance. *1148 He also was told by his supervisor, Frank Minardi, that his position was being eliminated (although Mr. Donato alleges that another employee subsequently was assigned to perform all of his duties). On November 15, 1994, just two days before his thirtieth-year anniversary with AT & T, Mr. Donato was discharged.
Mr. Donato filed a charge of discrimination on July 17, 1995, which the EEOC did not timely resolve. He then filed a single-count complaint in state court on July 3, 1996, seeking reinstatement, compensation, and punitive damages up to $100,000. AT & T removed the case to federal court on the basis of diversity and then moved to dismiss the case, arguing that the Act only protects marriage status in general and does not prohibit discrimination against a person because he or she is married to a particular person, e.g., a foreign citizen, a disabled person, or a troublemaker. The District Court granted AT & T's motion in a brief order issued February 21, 1997, and upon Mr. Donato's failure to amend his complaint, the case was dismissed with prejudice on March 11, 1997.
Id. at 1330. Petitioner appealed to the Eleventh Circuit Court of Appeals, which, after hearing oral argument, certified the above question to this Court. Id. at 1332. In doing so, the circuit court noted that this Court has not yet addressed whether a discharged employee can assert a claim based on marital status discrimination under section 760.10 of the Florida Statutes "where the employee allegedly was discharged in retaliation for actions of his spouse." Id. at 1330.

LEGAL ANALYSIS
Donato argues that the term "marital status" should be broadly defined, as it has been by the Florida Commission on Human Relations,[1] to include the identity and actions of one's spouse as well as whether one is married, single, divorced, separated or widowed. AT & T, on the other hand, argues that the term "marital status" must be construed in accordance with its common and ordinary meaning and may not be extended to encompass situations not intended by the legislature. Under its plain and ordinary meaning, AT & T contends, "marital status" means simply an individual's legal status with respect to marriage-i.e., married, single, widowed, divorced, or separated.

Marital Status
During the 1970s, many states amended their anti-discrimination statutes by adding the term "marital status" to the list of protected classes. See John C. Beattie, Prohibiting Marital Status Discrimination: A Proposal for the Protection of Unmarried Couples, 42 Hastings L.J. 1415, 1417 (1991). In 1977, the Florida Legislature expanded its Civil Rights Act ("Act") (formerly known as the Florida Human Relations Act) to include age, handicap, and marital status among the list of proscribed forms of discrimination. See ch. 77-34a, § 1, Laws of Florida. Importantly, this legislation provided greater protection to Florida citizens than is provided under the federal Civil Rights Act, which, for example, does not include protection for marital status.[2]
*1149 The general purpose of Florida's Act is to "secure for all individuals within the state freedom from discrimination" and "to protect their interest in personal dignity, to make available to the state their full productive capacities, to secure the state against the domestic strife and unrest, to preserve the public safety, health and general welfare, and to promote the interests, rights and privileges of individual's within the state." Ch. 77-341, § 1, at 1462 (codified at § 13.201, Fla. Stat. (1977)) (current version at § 760.01(2), Fla. Stat. (1997) (Civil Rights Act of 1992)). The Legislature has further noted that the act is to be construed in accord with the fair import of its terms and shall be liberally construed to further the general purposes stated therein. See § 760.01(3). Within the same piece of legislation, the Legislature created a provision enumerating unlawful employment practices. See ch. 77-341, § 6 (codified at § 13.261, Fla. Stat. (1977)). That provision is now codified at section 760.10, Florida Statutes (1997), and states in pertinent part:
(1) It is an unlawful employment practice for an employer:
(a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status.
§ 760.10(1)(a), Fla. Stat. (1997). Unfortunately, the Civil Rights Act fails to define the term "marital status".
Indeed, our research reflects that most of the jurisdictions which have included "marital status" within their antidiscrimination statutes have failed to provide any definition of the term. However, most of the states that define the term do so narrowly. See, e.g., D.C.Code Ann. § 1-2502(17) (1981) ("the state of being married, single, divorced, separated, or widowed and the usual conditions associated therewith, including pregnancy or parenthood"); 775 Ill. Comp. Stat. Ann. 5/1-103(J) (West Supp.1999) ("the legal status of being married, single, separated, divorced or widowed"); Md. Ann.Code art. 49B, § 20 (Supp.1999) ("the state of being single, married, separated, divorced, or widowed" in context of housing discrimination only); Wash. Rev.Code. § 49.60.040(7) (1998) ("the legal status of being married, single, separated, divorced, or widowed"); Wis. Stat. Ann. § 111.32(12) (West Supp. 1998) ("the status of being married, single, divorced, separated or widowed"); but see, e.g., Minn.Stat. Ann. § 363.01 subd. 24 (West Supp.2000) ("whether a person is single, married, remarried, divorced, separated, or a surviving spouse and, in employment cases, includes protection against discrimination on the basis of the identity, situation, actions, or beliefs of a spouse or former spouse").
We also note that there is little to no documented legislative history on the subject in Florida or elsewhere. As one commentator notes:
Significantly, however, not one marital status discrimination case has cited the *1150 legislative history and debate surrounding the addition of the term "marital status" to existing antidiscrimination statutes. In fact, such documented history appears to be largely unavailable. Thus, the court's only guide in discerning the legislative purpose behind the prohibition of marital status discrimination is the language of the statute itself.
Beattie, supra, at 1428. We are also hindered by the lack of judicial treatment of the term "marital status" in Florida. Only one district court has analyzed a claim based on marital status discrimination, and it did not decide the issue. In National Industries, Inc. v. Commission on Human Relations, 527 So.2d 894 (Fla. 5th DCA 1988), Sharon Morand filed a complaint with the Commission based on marital status discrimination after she was fired by her employer, National Industries, because of actions by her spouse, Robert Morand, a former employee of the same employer. The Commission found that Sharon had stated a cause of action for marital status discrimination. In doing so, it relied on its decision in Owens v. Upper Pinellas Association for Retarded Citizens, 8 F.A.L.R. 438 (Fla. Comm'n. on Human Relations 1985), which broadly interpreted the term "marital status" to include the identity of the individual's spouse. The Fifth District, however, reversed the ruling, holding that the Commission's interpretation of section 760.10 was erroneous. National Industries, 527 So.2d at 897. The district court noted that Owens involved a dispute over an antinepotism policy, which was distinguishable from the situation involving Sharon Morand, who was fired not because of her marital status, but because the employer wanted to keep her husband off the premises. Id. In a footnote, but without deciding the issue, the district court recognized the Commission's adherence to a broad definition of the term "marital status," but noted that even under a broad definition of the term, the case did not fall within the scope of "marital status" discrimination. See National Industries, Inc., 527 So.2d at 897 n. 1 (relying on Cybyske v. Independent School District No. 196, 347 N.W.2d 256 (Minn.1984) (holding that identity of spouse is factor to consider but dismissing cause of action based on marital status discrimination where institution of marriage not directly affected by employer's action)). Consequently, the district court did not determine in National Industries whether the term "marital status" includes the identity of one's spouse or merely the state of being married or unmarried.
In essence, then, we are left with the task of interpreting the Legislature's intent based solely on the words utilized in the statute without any instruction or indication from the Legislature as to whether "marital status" refers only to the status of being married, single, divorced, etc., or whether the term includes a much broader scope by including the identity of one's spouse as advocated by Donato.

Statutory Construction
Absent an explicit statutory definition or helpful legislative history, we must rely on other means to resolve the issue before us. We begin our analysis with the fundamental premise that legislative intent is the polestar that guides us in our inquiry. See McLaughlin v. State, 721 So.2d 1170, 1172 (Fla.1998). In turn, of course, the primary source for determining legislative intent is the language chosen by the Legislature to express its intent. As we stated in Holly v. Auld, 450 So.2d 217 (Fla.1984),
[w]hen the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning.
Id. at 219 (quoting A.R. Douglass, Inc. v. McRainey, 102 Fla. 1141, 1144, 137 So. 157, 159 (1931)). More importantly, we are precluded from construing
an unambiguous statute in a way which would extend, modify, or limit, its express *1151 terms or its reasonable and obvious implications. To do so would be an abrogation of legislative power.
Id. (quoting American Bankers Life Assurance Co. v. Williams, 212 So.2d 777, 778 (Fla. 1st DCA 1968)).
In the majority of states that have construed the term "marital status," most have done so in the context of an antinepotism or no-spouse employment rule. In declaring such employment policies discriminatory, several states have construed the term "marital status" broadly to include the identity of one's spouse in addition to whether one is simply married or unmarried. The Minnesota Supreme Court in Kraft, Inc. v. State, 284 N.W.2d 386 (Minn.1979), explained its reasoning:
We reject the view that "marital status", while it denotes the fact that one is or is not married, does not embrace the identity or situation of one's spouse. Since respondent does employ married, single and divorced individuals, to hold otherwise would condone discrimination against a portion of a protected class, i.e., job applicants already married to full-time Kraft employees. To do so would ignore the broad prohibition against arbitrary classifications embodied in the Human Rights Act and would elevate form over substance.
Id. at 388 (citations omitted); see also Ross v. Stouffer Hotel Co., 76 Hawai`i 454, 879 P.2d 1037 (1994); Thompson v. Board of Trustees, 192 Mont. 266, 627 P.2d 1229 (1981); Washington Water Power Co. v. Washington State Human Rights Comm'n, 91 Wash.2d 62, 586 P.2d 1149 (1978).
In contrast, a number of states have interpreted the term "marital status" narrowly by limiting it to the state of being married, single, divorced, widowed or separated. Indeed, the New York Court of Appeals in Manhattan Pizza Hut, Inc. v. New York State Human Rights Appeal Board, 51 N.Y.2d 506, 434 N.Y.S.2d 961, 415 N.E.2d 950 (1980), after noting the fundamental rule that words of common usage should be given their ordinary meaning, stated its view that:
[T]he plain and ordinary meaning of "marital status" is the social condition enjoyed by an individual by reason of his or her having participated or failed to participate in a marriage. Illuminated another way, when one is queried about one's "marital status", the usual and complete answer would be expected to be a choice among "married", "single", etc., but would not be expected to include an identification of one's present former spouse and certainly not the spouse's occupation.
Id. at 953; see also Muller v. BP Exploration, Inc., 923 P.2d 783, 788 (Alaska 1996) (defining marital status as "condition of being married or unmarried"); Blackwell v. Danbury Hosp., No. 321561, 1996 WL 409370 (Conn.Super.Ct. June 26, 1996) (holding that legislative history clearly contemplates that "marital status" only refers to condition of being single, married, separated, divorced, or widowed); Boaden v. Department of Law Enforcement, 171 Ill.2d 230, 215 Ill.Dec. 664, 664 N.E.2d 61, 65 (1996) (defining "marital status" narrowly based on statutory definition-"the legal status of being married, single, separated, divorced, or widowed"); Whirlpool Corp. v. Civil Rights Comm'n, 425 Mich. 527, 390 N.W.2d 625 (1986) (defining marital status as state of being married or unmarried); Miller v. C.A. Muer Corp., 420 Mich. 355, 362 N.W.2d 650, 653 (1984) (holding that the relevant inquiry is "if one is married rather than to whom one is married"); Townshend v. Board of Education, 183 W.Va. 418, 396 S.E.2d 185 (1990) (defining marital status as state of being married or single).
The same narrow construction of the term "marital status" as applied by the New York Court of Appeals appears to have been applied in cases not involving antinepotism policies, but centered on the actions of an individual's spouse. See, e.g., Coyle v. Health Care & Retirement Corp., No. 1:93-CV-664, 1994 WL 928880 *1152 (W.D.Mich. June 1, 1994) (holding no marital status discrimination where plaintiff was discharged because supervisor disliked plaintiff's fiancé); Cybyske v. Independent Sch. Dist. No. 196, 347 N.W.2d 256 (Minn.1984) (holding no marital status discrimination where plaintiff discharged because of husband's educational views); State Div. of Human Rights v. Village of Spencerport, 78 A.D.2d 50, 434 N.Y.S.2d 52 (N.Y.App.Div.1980) (holding no marital status discrimination where plaintiff-wife discharged because of husband's position as local property tax assessor).
Donato, however, argues that the term "marital status" is ambiguous when that term is considered in conjunction with other provisions within section 760.10. He maintains that the term "marital status" is sufficiently broad on its face to include "the status of marriage or non-marriage in general" as well as "the status of marriage or non-marriage to a particular individual." Appellant's Initial Brief at 13. The ambiguity arises, he claims, when this definition is read in conjunction with the subsection within section 760.10 which exempts actions based on an antinepotism policy. See § 760.10(8)(d) (stating that it shall not be "an unlawful employment practice ... for an employer ... to ... (d) [t]ake or fail to take any action on the basis of marital status if that status is prohibited under its antinepotism policy"). The argument follows, therefore, that because the nature of an antinepotism policy necessarily considers the marital relationship of two employees, the statutory exclusion for such policies would be unnecessary if the term "marital status" only encompassed the state of being married or unmarried in general. Contrary to Donato's assertion, we do not believe that the legislative enactment of the antinepotism exclusion renders the term "marital status" ambiguous.
In 1992, the Legislature amended section 760.10 by adding several exceptions to the types of unlawful employment practices. The amended version of the statute provides in pertinent part:
(8) Notwithstanding any other provision of this section, it is not an unlawful employment practice ... for an employer... to:
. . . .
(d) Take or fail to take any action on the basis of marital status if that status is prohibited under its anti-nepotism policy.
§ 760.10(8)(d), Fla. Stat. (1993). Clearly, this section was intended to protect employers who utilize such policies from any liability for terminating or refusing to hire a person because that person is married to another employee. There is nothing within the language of the amended statute itself or the legislative history of the amendment that suggests the Legislature intended to include the identity or actions of an individual's spouse within the meaning of "marital status."
Moreover, by excluding antinepotism policies from actionable unlawful employment practices, we believe the Legislature intended to limit the scope of the term "marital status" instead of broaden it. In other words, so long as the employer acts in accordance with an antinepotism policy and does not terminate an individual based solely on whether that person is married or unmarried, the employer is not liable for "marital status" discrimination. See Beattie, Prohibiting Marital Status Discrimination: A Proposal for the Protection of Unmarried Couples, supra, at 1422. Beattie notes that:
The "narrow view" approach emphasizes that discrimination occurs only when marital status is the sole basis for the adverse employment decision. In the context of the antinepotism policy, it is clear that marital status is not the sole reason for the decision because, if it were, every married person would be affected. Instead, an antinepotism policy only disadvantages a subclass of married applicants: those who have spouses already working for the employer. Implicit in this "narrow view" approach, *1153 therefore, is the notion that if the challenged policy does not disadvantage all married people, none may invoke the state prohibition against marital status discrimination to challenge it.
Id. Thus, by legislatively upholding antinepotism policies, the Legislature apparently intended to narrow the scope of "marital status" by limiting actions filed on that basis to situations in which an employer discriminates solely on an individual's status relating to marriage.

Commission On Human Relations
We likewise reject Donato's contention that we must strictly defer to the Florida Commission on Human Relations' interpretation of the statute. The Commission is the administrative body created by the Legislature to administer the Florida Civil Rights Act. See § 760.03, .05, Fla. Stat. (1997); see supra note 1. As part of its duties, the Commission is permitted by the Legislature to hold hearings and render decisions on claims alleging discrimination. In administering this quasi-judicial function, the Commission has given meaning to the term "marital status" by defining it broadly
to include one's relationship to one's spouse, rather than narrowly to include only the fact that one is married, single, divorced, or widowed.
Owens v. Upper Pinellas Ass'n for Retarded Citizens, 8 F.A.L.R. 438 (Fla. Comm'n on Human Relations 1985);[3]accord Smith v. Food Lion, Inc., 17 F.A.L.R. 3040 (Fla. Comm'n on Human Relations 1994); Brown v. Viking Fire Protection, Inc., 15 F.A.L.R. 1625 (Fla. Comm'n on Human Relations 1992).
We recognize the general rule that the interpretation of a statute by the administrative agency or body "charged with its enforcement is entitled to great deference and should not be overturned unless clearly erroneous or in conflict with the legislative intent of the statute." See Mayo Clinic Jacksonville v. Department of Prof'l Regulation, 625 So.2d 918, 919 (Fla. 1st DCA 1993) (citing PW Ventures, Inc. v. Nichols, 533 So.2d 281 (Fla.1988)). However, because we conclude that the term "marital status" is not ambiguous, either by itself or in conjunction with the other provisions within the Civil Rights Act, we are less constrained to accept the Commission's interpretation of the statute.
Administrative construction of a statute, the legislative history of its enactment and other extraneous matters are properly considered only in the construction of a statute of doubtful meaning.

Florida State Racing Comm'n v. McLaughlin, 102 So.2d 574, 576-77 (Fla. 1958) (emphasis added); see also Mayo Clinic Jacksonville, 625 So.2d at 919. Indeed, *1154 the Legislature itself appears to have rejected the Commission's reasoning in Owens.[4] Thus, we reject the Commission's construction and rely instead on the plain meaning of the words used by the Legislature.

Statutory Exclusions
Finally, Donato contends that the addition of an antinepotism exclusion suggests that the Legislature intended to exclude from the list of discriminatory practices only those cases in which a person is discharged based on the existence of antinepotism policy and not cases in which a person is terminated in retaliation for actions by that person's spouse, as is the case herein. Thus, he argues that the Legislature should be presumed to have included other forms of marital status discrimination, such as termination due to the identity or actions of an individual's spouse, as an unlawful employment practice. We disagree with Donato's contention for reasons similar to those stated above.
The basis of Donato's argument presumes that the Legislature intended to define the term "marital status" broadly. However, without more explicit guidance from the Legislature, we are unable to presume or otherwise conclude that the Legislature intended to include within the scope of the term "marital status" such factors as the identity or actions of one's spouse. As we explained above, the antinepotism exclusion listed in section 760.10 merely suggests that the Legislature intended to limit the types of claims for which an employer may be held liable. There is simply no indication or language within the text of the act to suggest that the Legislature intended to exclude employers from liability if the allegedly discriminatory practice is based on an antinepotism policy, but hold employers liable for terminating or refusing to hire an individual on the basis of the identity or actions of an individual's spouse. Under the plain meaning of the statute in this case, "marital status" discrimination arises only when one either is terminated or not hired on the sole basis of that person's status with respect to marriage, which in this case means married, single, divorced, widowed, or separated. To construe the term "marital status" broadly to include the identity or actions of an individual's spouse would expand its meaning beyond that in which it is commonly and ordinarily used.

Plain Meaning
We agree with both the reasoning and logic of those judicial opinions applying a narrow construction of the term "marital status," and, in the absence of legislative intent to the contrary, we conclude that the meaning of the phrase "marital status" without more is limited to one's status as married or not married. As noted, we have consistently held that words or phrases in a statute must be construed in accordance with their common and ordinary meaning. In applying that rule to the phrase "marital status" we agree with the observations of the New York Court of Appeals quoted above from Manhattan Pizza Hut. Typically, for example, we believe that when one is asked for his or her marital status, the answer usually sought is whether that person is married, single, divorced, widowed, or separated. See, e.g., Fla. R. Civ. P. Form 1.984 (Juror Voir Dire Questionnaire) ("5. Marital Status: (married, single, divorced, widow, or widower) ________"). Thus, under the common usage of the term, marital status refers only to the state of being married or not married. If we were to give the term a broader definition by requiring courts to consider the specific person to whom someone is married, we would be expanding the term beyond its common, ordinary use and would give meaning to the term that was not intended by the Legislature. This would be an abrogation of legislative power. Holly.
*1155 We also note the difficulty courts have had in applying a broader definition. The court in Village of Spencerport, for example, held that a plaintiff who worked for the mayor of the Village had not stated a claim for marital status discrimination, even though she had been fired because of the actions of her husband:
The complainant's status must be the cause of the unlawful act, either because of the condition of marriage, singleness or whatever, or because the party charged is motivated by some proscribed bias toward the spouse.
Neither of these considerations motivated the Village. Complainant was not discharged because of her marital status or because of the race, creed or other prohibited consideration related to her husband. She was discharged because of her husband's actions as assessor. Her discharge was not based upon marital status because discharge was just as certain whether the assessor was her husband, or her brother, father or some other relative ... [S]ince the statute does not expressly or by necessary implication grant [the Division of Human Rights] jurisdiction to sanction the Village for discharging complainant as an act of political retaliation against her husband, the petition must be dismissed.
434 N.Y.S.2d at 55 (citations omitted) (footnote omitted) (emphasis supplied); see also National Industries. Had the Legislature intended to include the identity of an individual's spouse or bias against a spouse within the meaning of marital status for the purpose of expanding the scope of discriminatory practices, it certainly could have done so, and, of course, is free to do so after this decision.

CONCLUSION
Accordingly, we hold that the term "marital status" as used in section 760.10 of the Florida Statutes means the state of being married, single, divorced, widowed or separated, and does not include the specific identity or actions of an individual's spouse. We answer the certified question in the negative, holding that Florida does not recognize a cause of action for "marital status" discrimination where the basis of the claim rests on the allegedly unlawful discharge of an employee for actions by the employee's spouse. Having answered the certified question, we return this case to the United States Court of Appeals for the Eleventh Circuit for further proceedings.
It is so ordered.
HARDING, C.J., and SHAW, WELLS and LEWIS, JJ., concur.
PARIENTE, J., dissents with an opinion, in which QUINCE, J., concurs.
PARIENTE, J. dissenting.
I respectfully dissent. The majority correctly observes that the term "marital status" is not defined by statute. Then, after conceding that there could be a "broad" or "narrow" view of the term marital status and reviewing principles of statutory construction, the majority opinion gives the term a "narrow" meaning, which it asserts is unambiguous. I find the majority's analysis strained and inconsistent with principles of statutory construction.
In 1977, the Florida Legislature expanded its Civil Rights Act to prohibit discrimination in employment based on marital status. See ch. 77-341, § 1, Laws of Fla. The purpose of the Civil Rights Act is remedial. See Green v. Burger King Corp., 728 So.2d 369 (Fla. 3d DCA 1999). Remedial statutes should be liberally construed in favor of granting access to the remedy provided by the Legislature. See, e.g., Arrow Air, Inc. v. Walsh, 645 So.2d 422, 424 (Fla.1994); Martin County v. Edenfield, 609 So.2d 27, 29 (Fla.1992). Further, the express terms of the Act provide that it "shall be liberally construed to further the general purposes stated in this section and the special purposes of the particular provision involved." § 760.01(3), Fla. Stat. (1999).
*1156 I also disagree with the majority's failure to give deference to the interpretation of this undefined statutory term given by the administrative agency charged with administering the Civil Rights Act. The majority acknowledges the general and important rule of statutory construction that an agency's interpretation of a statute is entitled to great deference and should not be overturned unless clearly erroneous or it is in conflict with the legislative intent of the statute. See BellSouth Telecommunications, Inc. v. Johnson, 708 So.2d 594, 596 (Fla.1998). The majority further acknowledges that the Commission on Human Relations is the administrative body created by the Legislature to administer the Florida Civil Rights Act.
The majority also acknowledges that since at least 1985, the Commission has recognized that the term "marital status" must be construed broadly, and has interpreted it "to include one's relationship to one's spouse, rather than narrowly to include only the fact that one is married, single, divorced or widowed." Owens v. Upper Pinellas Ass'n for Retarded Citizens, 8 F.A.L.R. 438, 440-41 (Fla. Comm'n on Human Relations 1985); see Smith v. Food Lion, Inc., 17 F.A.L.R. 3040 (Fla. Comm'n on Human Relations 1994). However, the majority discards the principle of construction that would accord great deference to the Commission's interpretation by asserting that the principle only applies in cases of "doubtful meaning." Florida State Racing Comm's v. McLaughlin, 102 So.2d 574, 576 (Fla.1958). I disagree.
Finally, I disagree with the majority's failure to read the provisions of this statute together to ascertain the legislative intent. "It is axiomatic that all parts of a statute must be read together to achieve a consistent whole." Forsythe v. Longboat Key Beach Erosion Control Dist., 604 So.2d 452, 455 (Fla.1992). Further, "statutory phrases are not to be read in isolation, but rather within the context of the entire section." Acosta v. Richter, 671 So.2d 149, 154 (Fla.1996). When the Legislature amended section 760.10, it excepted employers with antinepotism policies from the prohibition against discriminating on the basis of marital status. In creating this exception, the Legislature apparently recognized that while an antinepotism policy is potentially discriminatory, it could advance legitimate business interests.
However, the wording of that exception is important. It states:
(8) Notwithstanding any other provision of this section, it is not an unlawful employment practice ... to:
(d) Take or fail to take any action on the basis of marital status if that status is prohibited under [the employer's] antinepotism policy.
§ 760.10(8)(d). Contrary to the majority's view, in my opinion, by excluding antinepotism policies from "marital status" claims, the Legislature clearly indicated its intent to embrace the broad meaning of marital status adopted by the Commission on Human Relations.
For these reasons, I dissent from the majority opinion.
QUINCE, J., concurs.
NOTES
[1] The Commission on Human Relations was created in part to "promote and encourage fair treatment and equal opportunity for all persons regardless of race, color, religion, sex, national origin, age, handicap, or marital status." § 760.05, Fla. Stat. (1997). Any person alleging discriminatory practices may file a complaint with the Commission. See id. § 760.11(1). If the Commission finds reasonable grounds to believe that a discriminatory act has occurred, the aggrieved party may file suit in circuit court or request an administrative hearing. See id. § 760.11(4). If the party requests an administrative hearing, the Commission may hear the case or request that the case be heard by an administrative law judge. See id. § 760.11(6).
[2] Under title VII of the federal civil rights act, an employer may not discriminate on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (1994). Title VII does not include marital status as a protected class. However, the District Court for the Southern District of Florida notes that "courts have held that discrimination based on marital status may be cognizable as gender discrimination where there is a disparate impact on one gender." Longariello v. School Bd. of Monroe County Fla., 987 F.Supp. 1440, 1449 (S.D.Fla.1997). This form of discrimination, known as gender-plus or sex-plus discrimination, prohibits "employers from treating single men differently from single women, but does not protect marital status alone." Id. In other words, federal case law created a subclass of proscribed discrimination based on the plaintiff's gender plus marital status.

In 1974, Congress created the Equal Credit Opportunity Act which prohibited creditors from discriminating against any applicant "on the basis of sex or marital status." Pub.L. 90-321, Title VII § 701, Oct. 28, 1974 (codified at 15 U.S.C. § 1691 (1994)) (emphasis added). The law was later amended in 1976 to include race, color, religion, national origin, and age as additional protected classes. Like Florida, the act does not define the term "marital status."
[3] In Owens, the petitioner was terminated from his position with the Upper Pinellas Association for Retarded Citizens (UPARC), following his marriage to another UPARC employee. Apparently, UPARC had an antinepotism policy which precluded related persons from working together. Owens then filed a petition with the Commission alleging that UPARC unlawfully discharged him based on his marital status. The Commission ruled that the term "marital status" must be construed broadly "to include one's relationship to one's spouse, rather than narrowly to include only the fact that one is married, single, divorced, or widowed." Id. at 440-41 (relying on Kraft, Inc. v. Minnesota, 284 N.W.2d 386 (Minn.1979) (holding that anti-nepotism policy discriminates on basis of marital status, the definition of which includes identity or situation of one's spouse)). It further concluded that absent legislative intent to the contrary, a broad interpretation was consistent with the Legislature's overall purpose in enacting the Civil Rights Act and with the Legislature's stated intent to construe such provisions liberally. Accordingly, it concluded that UPARC violated section 760.10(1)(a) by discharging Owens on the basis of his marital status. Id. at 445. It appears, however, that in enacting the antinepotism exclusion to the list of proscribed employment practices under Florida's Civil Rights Act, the Legislature may well have intended to reverse the Commission's ruling in Owens. See Fla. S. Comm. on Com., S.B. 18H (1992) Staff Analysis 1 (May 27, 1992) (on file with comm.) ("The effect of the amendment would be to reverse the Commission's ruling.")
[4] See supra note 3.