NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

CITY OF TREASURE ISLAND, a )
municipality within Pinellas County, )
Florida, )
)
   Appellant, )
)
v. )   Case No. 2D14-5406
)
TAHITIAN TREASURE ISLAND, LLC, a )
Florida limited liability company; PAGE )
TERRACE MOTEL, INC., a Florida )
corporation; CAIDAN ENTERPRISES, )
LLC, a Florida limited liability company; )
DAVID KING; ARTHUR CZYSZCZON; )
and KEVIN McINERNEY, )
)
   Appellees. )
              )

Opinion filed October 27, 2017.

Appeal from the Circuit Court for Pinellas
County; Pamela A.M. Campbell and Jack
Day, Judges.

Kevin S. Hennessey and Jennifer R.
Cowan of Lewis, Longman, & Walker,
P.A., Bradenton, for Appellant.

Courtney L. Fernald and Leonard S.
Englander of Englander Fischer, St.
Petersburg, and Martha Collins of
Collins Law Group, Tampa, for
Appellees.

SALARIO, Judge.

The City of Treasure Island appeals from a final summary judgment in favor of Tahitian Treasure Island, LLC; Page Terrace Motel, Inc.; Caidan Enterprises, LLC; David King; Arthur Czyszczon; and Kevin McInerney (collectively, the Hoteliers). The dispute centers on claims by the Hoteliers that the City allows and hosts driving and parking on Treasure Island Beach in connection with festivals and public events in violation of section 161.58(2), Florida Statutes (2014), which prohibits "[v]ehicular traffic" on "coastal beaches" in Florida. The trial court agreed with the Hoteliers, declared that the "City's activities of hosting and allowing vehicular parking and driving on Treasure Island Beach" violate section 161.58(2), and permanently enjoined the City from hosting or allowing any parking and driving on Treasure Island Beach.

As we explain below, we find no error in the trial court's decision that the manner in which the City hosts public parking at the events that are the subject of the Hoteliers' complaint involves vehicular traffic on a coastal beach and is therefore prohibited by section 161.58(2). However, the trial court also declared illegal and enjoined other conduct that either does not constitute vehicular traffic (e.g., the movement of vehicles across the beach for purposes of event set-up) or is outside the scope of the Hoteliers' complaint and the summary judgment record. That was error. We affirm in part, reverse in part, and remand for further proceedings.

### The Parties, The Dispute, And The Summary Judgment

The City is a beach community located on the coast of the Gulf of Mexico. The Hoteliers are the owners of three beachfront hotels in the City. Their properties are located upland of the central beach area of Treasure Island Beach. The area is central

because it is located in the middle of Treasure Island and is beach because it fronts the shoreline along the Gulf.  The central beach area is uncommonly wide for a Gulf Beach, stretching 800 to 900 feet from the water's edge to a City-owned, paved walkway that meanders around dunes at the landward side of the beach.

The City uses a large, sandy expanse in the middle of the central beach area to host several civic events each year, either on its own or by allowing certain organizations to do so.  They range from carnivals to music festivals to car and truck shows to fireworks displays.  These events often involve the construction of temporary structures—e.g., a tent, a carnival ride, or a stage—that are removed when the event has ended.  The events have happened as often as thirty times a year.

To accommodate the attendees, the City makes temporary public parking areas available for the events.  These public parking areas are located on a sandy region of the beach.  The public can access them by driving along sandy, unpaved access paths that run from a paved lot near the walkway between the dunes, onto the beach, and into the temporary lots.  The City collects a fee for the use of the beach parking areas.  The number of cars taking advantage of the City-hosted beach parking varies from event to event, but on our record, it appears to have involved as many as 130 cars in the beach parking areas at past events.

In addition to public parking, the City also allows vehicles performing functions related to the events it hosts to drive and park on the beach.  A vendor selling food and drink might drive a food truck onto the beach and park it there for that purpose.  Similarly, a truck hauling a carnival attraction might drive over the beach and then park there for purposes of placing the attraction for the event and later removing the

attraction after the event has ended.  This activity is authorized by the City's ordinance that prohibits parking and driving on the beach, subject to certain exceptions, which include "participants and support staff for set-up and break-down of special events." See Treasure Island, Fla., Code of Ordinances of the City of Treasure Island, Fla. ch. 58, art. II, § 58.38(4) (1985).

Believing that driving and parking on the beach in connection with these events violates state law—including section 161.58(2)'s prohibition of vehicular traffic on coastal beaches—the Hoteliers sued the City in circuit court.  Their amended complaint asserted three counts: Count I sought an injunction to prohibit the driving and parking on the beach and to require the City to strike that provision of its ordinance allowing it; Count II sought a judgment declaring that the driving and parking on the beach violates section 161.58(2); and Count III sought a judgment declaring that the City had violated a decree in earlier, related litigation between the City and the Treasure Island Motel Association.

The issues the City raises on appeal were decided on multiple motions for summary judgment filed by both the plaintiffs and the defendant.  That led to some convoluted proceedings, but the procedural play-by-play is not relevant to the issues we decide.  The bottom line is that the Hoteliers voluntarily dismissed Count III, and the parties proceeded to a decision on Counts I and II based on undisputed facts.  The Hoteliers argued that the beach parking and driving involved in the civic events on Treasure Island Beach violate section 161.58(2) because (1) the events occur on coastal beaches within the meaning of the statute and (2) the movement and parking at those events constitutes vehicular traffic that is prohibited within the meaning of the

- 4 -

statute. The City disputed both points, arguing that (1) the portion of Treasure Island Beach on which its events are held is not a "coastal beach" under section 161.58 because it is not technically a "beach" as that term is defined within chapter 161 and that even if it is a coastal beach, (2) the statute's term "[v]ehicular traffic" contemplates the movement of vehicles as though it were occurring along a public street or highway and is limited to "Daytona Beach-style driving," a characterization the City says cannot be applied to the movement and parking of vehicles at the events that are the subject of the Hoteliers' complaint.

The trial court denied the City's motions for summary judgment and granted the Hoteliers' motions. It entered a judgment that declared "that the City's activities of hosting and allowing vehicular parking and driving on Treasure Island Beach are in violation of Fla. Stat. § 161.58" and that the City Ordinance "is null and void to the extent that it conflicts with Fla. Stat. § 161.58 and purports to allow vehicular parking and driving on Treasure Island Beach." Based on its summary judgment determination that the City's activities violate section 161.58, the trial court's judgment further permanently enjoined the City "from hosting or allowing vehicular parking and driving on Treasure Island Beach." The City timely appealed.

### The Issues On Appeal

There is one significant argument that the City raised in the trial court that it has not raised on appeal—that the events at issue do not occur on a "coastal beach" within the meaning of section 161.58(2). Accordingly, we assume for purposes of this opinion that they do occur on a coastal beach and express no judgment on that legal question. The City does, however, argue that the driving and parking of vehicles in

connection with the subject events do not constitute "[v]ehicular traffic" as used in the statute and, further, that the relief the trial court ordered is overbroad.  We address those issues below.[1]

### *Beach And Shore Regulation And The Activities The City Hosts*

Understanding the City's arguments requires understanding the statutory context in which section 161.58 resides—chapter 161, which governs beach and shore preservation—and how the activities involved in this case relate to it.  Two parts of chapter 161 are implicated here: part I governs construction and other activity seaward of a coastal construction control line, and part III adds protections for parts of coastal areas deemed especially sensitive.

Coastal construction control line permitting under part I.  First adopted in 1965, part I—which, taken together with part II, is called the Dennis L. Jones Beach and Shore Preservation Act—limits construction and physical activity in coastal areas, regulates how that construction and activity can occur, and provides enforcement mechanisms for violations.  In the 1970s, the legislature added provisions to part I to regulate construction seaward of a "coastal construction control line" to be established by the Department of Environmental Protection.  See generally § 161.053, Fla. Stat. (1971).  The legislature's stated purpose in adopting these provisions was to protect beaches and coastal barrier dunes from imprudent construction.  § 161.053(1)(a).

---

[1]We reject without comment the City's remaining appellate arguments.  In addition, we note that the Hoteliers did not plead a violation of section 161.58(1) concerning vehicular traffic on the dunes and native stabilizing vegetation of the dune system of coastal beaches in their complaint.  Accordingly, we express no opinion on whether or to what extent that subsection is implicated by the facts here.

In current form, these statutory provisions require the department to establish coastal construction control lines on a county-by-county basis along the coasts of the state. § 161.053(1)(a), Fla. Stat. (2014). In general, those control lines are to "be established so as to define that portion of the beach-dune system which is subject to severe fluctuations based on 100-year storm surge, storm waves, or other predictable weather conditions." Id.; see also § 161.053(2)(a) (describing process required for establishing coastal construction control lines). Once a control line is established, it is unlawful to "construct any structure whatsoever seaward thereof; make any excavation, remove any beach material, or otherwise alter existing ground elevations; [or] drive any vehicle on, over, or across any sand dune" unless one has a permit issued by the department. § 161.053(2)(a). A coastal construction control line permit can be issued only if certain statutory criteria related to the effect of the proposed activity on the land seaward of the control line are established. See § 161.053(2)(a), (4)(a).

The department has established a control line for Pinellas County that runs through Treasure Island. The beach events the City hosts occur seaward of that line. Before hosting those events, therefore, the City has applied for and obtained coastal construction control line permits from the department. Prior to January 2014, it received field permits—which are issued for minor structures and activities—for all but two of its events. See Fla. Admin. Code R. 62B-33.008(10) (2014). Those field permits approved the events specified on a site plan submitted by the City and authorized the City to conduct them.

For the two events that did not receive field permits and for every event the City has hosted since January 2014, the department has required that the City

obtain individual coastal construction control line permits.  The City has filed permit applications on a form provided by the department in accord with regulations promulgated by the department.  See generally id. R. 62B-33.008.  Those applications describe the event and activities to take place and include a site plan.  The department has approved each of the City's applications, subject to general conditions included in every permit and sometimes special conditions specific to the event being permitted.

As an example, the City applied for a permit for "The Greatest Show on Surf" to be held in March 2014.  The application for the permit described the event as including "carnival rides, food & non-food vendors, stage for live entertainment, and parking on the beach."  It specified the dates of the event, as well as the dates for set up and break down, and included a site plan.  After reviewing the application, the department advised the City that its permit application was approved and then issued a notice to proceed stating that the City "is authorized to arrange carnival rides, food and non-food vendors, stage live entertainments and parking."  The event was permitted to be held on the nonvegetated beach and to be located 290 feet seaward of the coastal construction control line.  It was subject to the general conditions, among others, that "[c]onstruction traffic shall not occur . . . on vegetated areas seaward of the coastal construction control line unless specifically authorized by the permit."

Part III and the regulation of vehicular traffic on coastal beaches.  In 1985, the legislature added part III to chapter 161, which is known as the Coastal Zone Protection Act of 1985.  § 161.52, Fla. Stat. (1985).  In passing it, the legislature recognized that coastal areas serve important aesthetic, ecological, and public health, safety, and welfare functions and have become subject to increasing growth pressures.

See generally § 161.53(1)-(5).  Its stated intent is "that the most sensitive portion of the coastal area shall be managed through the imposition of strict construction standards in order to minimize damage to the natural environment, private property, and life."
§ 161.53(5), Fla. Stat. (2014).

Part III serves that objective by establishing minimum standards governing the location of construction in coastal areas and mandating that any such construction produce the "minimum adverse impact" on the "beach" and "dune system."  See § 161.55(1).  Part III provides that these minimum construction standards do not "limit or abrogate the right and power of the department to require permits or to adopt and enforce standards pursuant to [part I] for construction seaward of the coastal construction control line that are as restrictive as, or more restrictive than" the minimum construction standards in part III.  § 161.56(1).  It also provides for enforcement of those minimum standards and requires sellers of coastal properties subject to part III to make disclosure to buyers of the regulations governing them.  See §§ 161.56(2), .57.

Part III also contains the provision at issue here—section 161.58.  That statute provides as follows:

> (1) Vehicular traffic, except that which is necessary for cleanup, repair, or public safety, and except for traffic upon authorized local or state dune crossovers, is prohibited on the dunes or native stabilizing vegetation of the dune system of coastal beaches.  Except as otherwise provided in this section, any person driving any vehicle on, over, or across any dune or native stabilizing vegetation of the dune system shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

> (2) Vehicular traffic, except that which is necessary for cleanup, repair, or public safety, or for the purpose of maintaining existing licensed and permitted traditional commercial fishing activities or existing authorized public

accessways, <u>is prohibited on coastal beaches</u> except where a local government with jurisdiction over a coastal beach or portions of a coastal beach has:

(a) Authorized such traffic, by at least a three-fifths vote of its governing body, on all or portions of the beaches under its jurisdiction prior to the effective date of this act; and

(b) Determined, by October 1, 1989, in accordance with the rules of the department, that less than 50 percent of the peak user demand for off-beach parking is available. . . .

(3) A local government authorizing such vehicular traffic on all or portions of its beaches pursuant to subsection (2) may later prohibit, by a vote of at least three-fifths of its governing body, such vehicular traffic on all or portions of the beaches under its jurisdiction. Any such local government shall be authorized by a three-fifths vote of its governing body to charge a reasonable fee for vehicular traffic access. The revenues from any such fees shall be used only for beach maintenance; beach-related traffic management and parking; beach-related law enforcement and liability insurance; or beach-related sanitation, lifeguard, or other staff purposes. <u>Except where authorized by the local government, any person driving any vehicle on, over, or across the beach shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.</u>

(Emphasis added.) As we describe in greater detail below, the Hoteliers' assertion that the beach driving and parking taking place in connection with the City-sponsored activities at issue requires that we consider whether activities permitted by the department under part I are restricted by prohibition on vehicular traffic in part III.

### *The Movement Of Vehicles Incident To Department-Permitted Construction And Activities Does Not Involve Vehicular Traffic; The Movement Of Vehicles Incident To City-Operated Public Parking Areas Does*

The final judgment invalidates and prohibits any "vehicular parking and driving" on Treasure Island Beach, except as authorized by section 161.58. That implies a definition of "vehicular traffic" that reaches any movement of vehicles across

Treasure Island Beach. The City, however, contends that the term "[v]ehicular traffic" as used in section 161.58 refers only to "Daytona Beach-style driving" and that the City's events and the associated public parking do not involve that kind of activity.[2] The City does not define its term "Daytona Beach-style driving," but its argument implies a condition in which a local government allows the public to use the beach as a public street, cars drive on the beach using established lanes for everyday use, and cars are also permitted to park on the beach. We agree that the statutory term "[v]ehicular traffic" is limited to the movement of vehicles as along a public street, but we disagree that it is also limited to the unique features of Daytona Beach-style driving.

In interpreting a statute, we look first to "the plain meaning of the actual language" contained in the statutory text. Diamond Aircraft Indus., Inc. v. Horowitch, 107 So. 3d 362, 367 (Fla. 2013). If that language is unambiguous, there is no need for further construction; the plain meaning of the statute controls. See Holly v. Auld, 450 So. 2d 217, 219 (Fla. 1984). If the statutory language is ambiguous, however, we turn to rules of statutory construction to determine its meaning. English v. State, 191 So. 3d 448, 450 (Fla. 2016). We regard statutory language as ambiguous when it is reasonably susceptible of more than one interpretation. See License Acquisitions, LLC v. Debary Real Estate Holdings, LLC, 155 So. 3d 1137, 1146 (Fla. 2014).

We begin by noting that the term "[v]ehicular traffic" is not statutorily defined and that nothing in section 161.58 or the related statutes indicates that it carries particular, specialized meaning. We must therefore try to give the term the meaning it

---

[2]These are questions of statutory construction resolved by way of motions for summary judgment. Our review is de novo. See Dep't of Transp. v. United Capital Funding Corp., 219 So. 3d 126, 129 (Fla. 2d DCA 2017).

has in ordinary, everyday discourse.  See Donato v. Am. Tel. & Tel. Co., 767 So. 2d 1146, 1154 (Fla. 2000); Am. Heritage Window Fashions, LLC v. Dep't of Revenue, 191 So. 3d 516, 520 (Fla. 2d DCA 2016).  For our purposes, the word "vehicular" is plain enough: It means involving vehicles.  Here we are talking about cars and trucks, and everyone in this case agrees that those are types of vehicles.  The interpretive problem we must address hinges on the word "traffic."

Sources that convey the ordinary meaning of the term "traffic" support both the notion that as used in section 161.58, traffic involves any movement of vehicles in an area and the notion that traffic means the movement of vehicles as along a street or highway.  See Webster's Third New International Dictionary 2423 (1986) (defining "traffic" variously as "the circulation (as of vehicles or pedestrians) through an area" and "the flow of vehicles, pedestrians, ships, or planes (as along a street or sidewalk or sea lane)); Traffic, Black's Law Dictionary (5th ed. 1979) (defining "traffic" as "the passing to and fro of persons, animals, vehicles, or vessels, along a route of transportation, as along a street, highway, etc."); see also Dictionary.com, Dictionary.com Unabridged, http://www.dictionary.com/browse/traffic (last visited Oct. 25, 2017) (defining "traffic" as "the movement of vehicles, ships, persons, etc., in an area, along a street, through an air lane, over a water route, etc.").  To the extent the term "traffic" refers to movement as along a street or highway, those sources also support the notion that it refers to the movement of vehicles as along a way that is open for use by the public.  See Webster's Third New International Dictionary 1069, 2259 (1986) (defining "street" as "a public

thoroughfare" or "the strip of a public thoroughfare reserved for vehicular traffic" and defining "highway" as "a road or way . . . that is open to public use").[3]

In terms of ordinary meaning, then, the term "vehicular traffic" could reasonably be understood to mean any movement of vehicles or the movement of vehicles as along a public thoroughfare. Both meanings are facially consistent with the purpose of section 161.58 conveyed by its text—the protection of the beach, dunes, and stabilizing vegetation from harm caused by vehicles—and nothing in that text indicates which meaning was the one adopted by the legislature. The statute is therefore ambiguous, and we must turn to rules of statutory construction to resolve which of these two interpretations of the term is the one the legislature meant.

We are confident that vehicular traffic denotes the movement of vehicles as though it were happening along a public street or highway. We reach that conclusion because the alternative—the interpretation that vehicular traffic reaches any movement of vehicles—would put section 161.58's regulation of vehicular traffic on coastal beaches in substantial conflict with the authority granted the department in part I to authorize by permit construction and other activity on those same beaches.

As we have described, part I of chapter 161 was the first-adopted set of statutes bearing on beach and shore protection, and it prohibited construction and other activities seaward of the coastal construction control line without a permit, which it in

---

[3]We recognize that dictionaries are only one permissible indicator of the ordinary meaning of a term. See Green v. State, 604 So. 2d 471, 473 (Fla. 1992). Here, we have no reason to believe that the term "traffic" bears some other relevant ordinary meaning that is not revealed by these dictionary definitions. See, e.g., § 316.003(57), Fla. Stat. (2014) (similarly defining the word "traffic" within the chapters on motor vehicles).

turn authorized the department to grant.  See § 161.053(2)(a), (4)(a).  Thus, if the City wants to host a carnival on Treasure Island Beach, it must apply for a permit authorizing those activities and any construction they involve, and the department enjoys the statutory authority to grant that permit if it makes the required determinations.

Section 161.58 was enacted years after part I as one section of part III and operates, among other things, as a limit on the department's permitting authority. Whatever construction and activities the department might be authorized to permit seaward of the coastal construction control line in part I, it cannot permit vehicular traffic on the dunes and native stabilizing vegetation of coastal beaches or the coastal beaches themselves because section 161.58 bans those activities subject to a handful of exceptions.  Because the legislature did not include "as permitted by the department" as an exception to section 161.58's prohibitions on vehicular traffic on the beaches and dunes, we must conclude that the statute contains no such exception.  See Hayes v. State, 750 So. 2d 1, 4 (Fla. 1999) ("We are not at liberty to add words to statutes that were not placed there by the [l]egislature.").

Interpreting section 161.58's prohibitions on vehicular traffic to reach any movement of vehicles on the dunes or beach, however, would effectively repeal much of the statutory authority granted to the department in part I to permit construction and other activities seaward of the coastal construction control line.  The department's authority to permit construction and activity on beaches and dunes seaward of the control line necessarily includes the authority to permit the movement of vehicles necessary to enable that construction or activity because "[a] statutory grant of power or right carries with it by implication everything necessary to carry out the power or right

- 14 -

and make it effectual and complete." Brock v. Bd. of Cty. Comm'rs of Collier Cty., 21 So. 3d 844, 847 (Fla. 2d DCA 2009) (quoting Deltona Corp. v. Fla. Pub. Serv. Comm'n, 220 So. 2d 905, 908 (Fla. 1969)); see also McNeill v. Pace, 68 So. 177, 178 (Fla. 1915) ("Statutory powers expressly conferred carry with them by implication of law all consistent powers that are necessary to the effectual execution of the powers expressly conferred.").

This makes perfect sense. The department's authority to permit a carnival on the beach seaward of the control line, for example, is meaningless if it does not also include the power to allow vehicles to move onto that area of the beach for purposes of carrying tents and rides, moving equipment, providing concessions, and all other things that go into hosting a carnival. If the term "[v]ehicular traffic" in section 161.58 reaches any movement of vehicles, however, the department's authority to permit construction seaward of the control line will be substantially eliminated.

Established principles of statutory construction counsel strongly against that result. "[I]t is an accepted maxim of statutory construction that a law should be construed together and in harmony with any other statute relating to the same purpose, even though the statutes were not enacted at the same time." Wakulla Cty. v. Davis, 395 So. 2d 540, 542 (Fla. 1981); see also McDougall v. Van House, 801 So. 2d 118, 121 (Fla. 2d DCA 2001). For that reason, "[c]ourts should avoid a construction which places in conflict statutes which cover the same general field." City of Boca Raton v. Gidman, 440 So. 2d 1277, 1282 (Fla. 1983); McDougall, 801 So. 2d at 121.

Relatedly, it is also "presumed that statutes are passed with the knowledge of existing statutes, so courts must favor a construction that gives effect to

both statutes rather than construe one statute as being meaningless or repealed by implication." Butler v. State, 838 So. 2d 554, 556 (Fla. 2003). Thus, "[w]hile it is true that a prior Act may be repealed in part, or in toto by implication through the passage of a subsequent Act, such repeals are not favored and there must be a positive repugnancy between the two or a clear intent to repeal must be apparent." Wade v. Janney, 7 So. 2d 797, 798 (Fla. 1942) (citation omitted); see also Alvarez v. Bd. of Trs. of City Pension Fund for Firefighters & Police Officers in City of Tampa, 580 So. 2d 151, 153 (Fla. 1991).

Here, we are presented with two enactments related to the same subject matter—the protection of Florida's coastal areas. Some conflict between the two may be inevitable because section 161.58 prohibits vehicular traffic on coastal beaches and the dunes and native stabilizing vegetation regardless of how far the department's coastal construction permitting authority might reach. But construing the term "vehicular traffic" to mean the movement of vehicles as along a public road or highway, as opposed to merely any movement of vehicles, is both consistent with the ordinary meaning of the term "traffic" and limits the conflict between part I and section 161.58 to a minimum. It gives meaningful effect to both statutes and allows both to exist harmoniously to the maximum extent possible consistent with the ordinary meaning of the term "vehicular traffic."

This interpretation also makes sense of section 161.58 within the overall context of part III of chapter 161. See Cepcot Corp. v. Dep't of Bus. & Prof'l Regulation, 658 So. 2d 1092, 1095 (Fla. 2d DCA 1995) ("A statute should be construed in its entirety and within the context provided by the related statutes within the same act.").

- 16 -

Part III establishes minimum standards for certain coastal construction and provides that nothing in those standards—including section 161.58's prohibition on vehicular traffic—provides for the department to continue to issue coastal construction control line permits on terms as or more restrictive than those minimum standards. Thus, the Act allows construction seaward of the coastal construction line, and it preserves the department's permitting authority under part I so long as it is exercised in a manner consistent with the minimum standards the act establishes. When it passed section 161.58, therefore, the legislature was aware that coastal construction would continue and that the department would retain its permitting authority. An understanding of the term "vehicular traffic" that would ban all movement of vehicles on the dunes and beach—even movement of vehicles necessary to the construction part III itself allows—is inconsistent with the other provisions of part III. Instead, vehicular traffic should be understood as referring to the movement of vehicles as along a public street or highway.

Applying that understanding, the trial court erred in declaring that any "vehicular parking and driving" on Treasure Island Beach violates section 161.58, in declaring that the City's ordinance governing driving and parking on the beach is invalid, and in enjoining any parking or driving on the beach. It is clear beyond dispute that many aspects of the events the City hosts involve "vehicular parking and driving" on the beach that is limited to a defined category of people far narrower than the public, that is limited to the pursuit of activities permitted by the department, and that cannot be said to involve the use of the beach as though it were a public thoroughfare. The driving of vehicles across the beach to move and set up a stage for a concert, the driving and

- 17 -

parking of a food truck to provide food and drink at an event, or the driving of a vehicle to haul away a carnival tent are all examples of "vehicular parking and driving" that do not involve the use of a beach as a public highway. To the extent the trial court's ban on "vehicular parking and driving" reaches these kinds of activities, it must be reversed.

The City's operation of public parking areas presents a different matter. We agree with the City that parking a vehicle—leaving it stationary for a period of time—does not alone constitute vehicular traffic because parking in and of itself does not involve the movement of a vehicle. However, access to the parking areas the City operates is along two paths that cross the dunes and beach and that are open to the public for purposes of reaching the beach parking areas and are regulated as though they were public ways. That activity does involve the use of a portion of beach as though it were a public street—members of the public drive across it for purposes of getting from point A to point B on the beach—and thus does involve vehicular traffic.

The City argues that section 161.58 was intended only to reach "Daytona Beach-style driving," a characterization it says does not apply to cars driving over access paths to use parking areas. Limiting the scope of vehicular traffic to Daytona Beach-style driving is not a reasonable construction of section 161.58. There are a number of atypical aspects to Daytona Beach-style driving—for example, the large number of cars, the regularity of the use of the beach as a roadway, the existence of established lanes of traffic, and routinized enforcement. Yet, there is nothing in the text of section 161.58, the ordinary meaning of the term "vehicular traffic," or the context of the Coastal Zone Protection Act to support the notion that the vehicular traffic prohibited by the statute exists only when one or more of the conditions descriptive of Daytona

- 18 -

Beach-style driving exists.  On the contrary, the purpose that the text of the section 161.58 quite plainly evinces (a purpose to avoid harm to dunes and beaches as a consequence of vehicles being driven over them) implies that we should not narrow the scope of its term "[v]ehicular traffic" from the scope that its ordinary meaning (the movement of vehicles as though the beach or a portion of it was a public street) establishes.[4]

Additionally, when read in the context of section 161.58 as a whole, as we must when interpreting a statute, the City's proposed limitation on the scope of the term "[v]ehicular traffic" does not make sense.  See Ratliff v. State, 56 So. 3d 918, 919 (Fla. 2d DCA 2011) ("Further, each statute 'must be read as a whole with meaning ascribed to every portion and due regard given to the semantic and contextual interrelationship between its parts.' " (quoting Lamar Outdoor Advert.-Lakeland v. Dep't of Transp., 17

---

[4]The City argues that the legislature must have meant vehicular traffic to mean "Daytona Beach-style driving" because a supreme court decision shortly before section 161.58 was adopted described Daytona Beach-style driving using the term "vehicular traffic."  But the context there—a tort claim against the City of Daytona Beach by an injured sunbather—was so different that it would be speculation to say that the legislature plucked the term "vehicular traffic" from that case and intended it to have that and only that meaning.  See Ralph v. City of Daytona Beach, 471 So. 2d 1, 3 (Fla. 1983) ("While the fact of vehicular traffic on the beach was widely-known, it was not readily apparent to sunbathers . . . that this lethal mixture of cars and reclining persons was inadequately supervised.").  The City also points to a staff analysis underlying the Coastal Zone Protection Act that noted in one place that section 161.58 sought a "tightening of criteria allowing driving on the beach" and in another that beach driving was allowed in certain northeast Florida counties.  See Fla. H.R. Comm. Nat. Res., HB 118 (1988) Staff Analysis 2 (July 1, 1988).  We do not need to resort to staff analyses to reach our conclusion here.  See Kasischke v. State, 991 So. 2d 803, 810 (Fla. 2008) (questioning utility of staff analyses for this purpose).  Even if we were to rely on this staff analysis to determine the meaning of a statutory term, the language to which the City points does not command an inference that the legislature intended to limit the scope of the term "vehicular traffic" to Daytona Beach-style driving.

So. 3d 799, 802 (Fla. 1st DCA 2009))). The statute both prohibits vehicular traffic on coastal beaches and dunes and native stabilizing vegetation and subjects to prosecution for a second-degree misdemeanor "any person driving any vehicle on, over, or across" them. § 161.58(1), (2), (3). Given their placement in the same statute regulating the same activity, we should interpret the statutory prohibition on vehicular traffic as being coterminous with these criminal enforcement mechanisms. Cf. Payne v. State, 873 So. 2d 621, 622 (Fla. 2d DCA 2004) ("In construing two subsections of the same statute, we read the subsections in pari materia.").

When vehicular traffic is understood as moving a vehicle on the beach or a portion thereof as though it was a public way, both the general prohibition and criminal provisions easily make sense as a unified whole: The statute generally prohibits using the beach as though it was a public street, and someone driving on the beach in that manner is subject to prosecution. Limiting the term to Daytona Beach-style driving, however, makes a muck of the criminal enforcement provisions. It is nearly impossible to consider Daytona Beach-style driving as an offense that can be committed by an individual driver because Daytona Beach-style driving does not connote individual conduct; it connotes a state of affairs marked by the characteristics of the movement of vehicles along Daytona Beach. And even if the concept could be understood to refer to the conduct of an individual as distinguished from a state of affairs, the offense seems just as impossible to define. Try as we might, for example, we cannot conceive of what a jury would have to find to convict a defendant of Daytona Beach-style driving.

For these reasons, limiting the reach of section 161.58 to Daytona Beach-style driving is not a reasonable construction of the statute.[5]  As used in that statute, "[v]ehicular traffic" means the movement of vehicles as along a public street or highway.

### *The Injunction Is Overbroad In Other Respects*

In addition to prohibiting the movement and parking of vehicles that does not constitute vehicular traffic within the meaning of section 161.58, the final judgment's categorical ban on hosting or allowing any vehicular driving and parking on the beach reaches potential activity (or, in the case of "allowing," mere inactivity) that is unrelated to the civic events that are the subject of this litigation and that may well be legal.  Such relief is also well beyond the scope of the operative complaint, the Hoteliers' summary judgment motions, and the summary judgment record—all of which are focused on the legality or illegality of parking and driving on the central beach area of Treasure Island Beach in connection with the civic events about which the Hoteliers complain.  Apart from declaring illegal and enjoining activities that do not constitute vehicular traffic, then, the trial court also erred in awarding the Hoteliers a substantially overbroad injunction. See, e.g., Smith v. Wiker, 192 So. 3d 603, 604 (Fla. 2d DCA 2016) ("[A] court should not issue an injunction broader than necessary to protect the injured party under the particular circumstances."); see also Brower v. Hubbard, 643 So. 2d 28, 30 (Fla. 4th DCA 1994) ("Injunctions must be specifically tailored to each case; they should not

---

[5]Accordingly, we reject the City's argument that because section 161.58 contains penal provisions, the rule of lenity requires that it be construed in its favor.  See Paul v. State, 129 So. 3d 1058, 1064 (Fla. 2013) ("This rule of lenity is a canon of last resort and only applies if the statute remains ambiguous after consulting traditional canons of statutory construction.").

infringe upon conduct that does not produce the harm sought to be avoided."); Clark v. Allied Assocs., Inc., 477 So. 2d 656, 657 (Fla. 5th DCA 1985) ("An injunctive order should never be broader than is necessary to secure the injured party . . . relief warranted by the circumstances of the particular case.").

### *Conclusion*

We find no error in the trial court's determination that the City's actions in hosting vehicular traffic across the beach for purposes of reaching the parking areas associated with the civic events on the central beach area of Treasure Island Beach violate section 161.58(2).[6] The trial court went too far, however, to the extent it declared any additional conduct illegal, declared the City's ordinance invalid, and enjoined the City from "hosting or allowing" any "vehicular parking and driving on Treasure Island Beach." We reverse the final judgment to that extent, affirm it in all other respects, and remand the case for further proceedings consistent with this opinion. To the extent those proceedings are directed only toward modifying the final judgment to conform to our holdings today, any declaratory and injunctive provisions of that judgment should extend no further than declaring illegal and enjoining the conduct identified by this opinion as vehicular traffic on the central beach area of Treasure Island Beach in connection with the events that are the subject of the Hoteliers' complaint.

Affirmed in part; reversed in part; remanded.

KELLY and WALLACE, JJ., Concur.

---

[6]We have not considered whether there is any way in which the City could host parking on the beach in a manner that would not involve vehicular traffic in violation of section 161.58. Our opinion should not be understood as expressing any view on that question.